UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:12-cv-1848-T-33TBM

LIZETH LYTLE, Individually,
and on behalf of All Others
Similarly Situated Who Consent to Their
Inclusion in a Collective Action,

     Plaintiff,

v.

LOWE'S HOME CENTERS, INC., et al.,

     Defendants.

_____/

## LOWE'S MOTION TO DECERTIFY COLLECTIVE ACTION
## AND MEMORANDUM OF LAW IN SUPPORT

Defendants Lowe's Home Centers, Inc., Lowe's Companies, Inc., Lowe's HIW, Inc. and the Administrative Committee of Lowe's Companies, Inc. ("Lowe's"),[1] through undersigned counsel, move to decertify this case as a collective action.  In support of this Motion to Decertify Collective Action, Lowe's files the following Memorandum of Law.

## I.     INTRODUCTION

Plaintiff Lizeth Lytle, a former Human Resources Manager ("HRM") at Lowe's Home Centers, Inc., and the opt-in Plaintiffs ("Plaintiffs") seek to litigate as a collective action the claims of almost 900 former and current Lowe's HRMs from across the nation that they were allegedly misclassified as exempt employees and are owed overtime under the Fair

_____

[1] Lowe's Home Centers, Inc. (a named Defendant) was converted to Lowe's Home Centers, LLC on or about November 1, 2013. Lowe's HIW, Inc. (another named Defendant) was merged into Lowe's Home Centers, LLC on or about December 31, 2013.

Labor Standards Act ("FLSA").  However, the differences in Plaintiffs' working environments in Lowe's stores throughout the country, the individualized nature of Lowe's defenses, and principles of fundamental fairness and due process preclude collective treatment of their claims.  Based on the entire record now before the Court, Plaintiffs cannot meet their "stringent" burden of showing they are similarly situated.  Moreover, Plaintiffs cannot put forth representative evidence to support their claims such that a judge or jury can adjudicate in one trial the individualized claims of almost 900 HRMs.

The evidence adduced throughout litigation clearly illustrates dissimilarities among Plaintiffs on the main dispositive issue—whether they exercised independent judgment and discretion on matters of importance to Lowe's.  While some Plaintiffs testify that they never make or influence any decisions, others state that they routinely decide who is to be interviewed, actually make or substantially influence the hiring decisions at their stores, and investigate without supervision harassment, discrimination and disciplinary issues.  Some Plaintiffs state that they always follow directions from their Store Managers ("SM") and have no input or influence on major employment decisions, while others state that they advise their SMs and Assistant Store Managers ("ASM") on all disciplinary actions, and actually override disciplinary and even termination decisions made by upper management at their stores.  Some Plaintiffs declare that they spend the majority of their time on clerical work, like processing paperwork, providing customer service, or cleaning bathrooms, while others state that clerical tasks, manual work, and customer service are the most insignificant parts of their job.  The range of evidence in the record is broad and disparate on the very factors that the Court or a jury must assess under the administrative exemption test.  Thus, deciding the

merits of the FLSA misclassification claim will require individualized factual determinations for each Plaintiff, rendering a collective action unwarranted.

Additionally, allowing this case to proceed as a collective action would be unmanageable and unduly burdensome, given the absence of common proof, the extreme variances in the evidence, and the necessity of highly individualized fact determinations to adjudicate the individual claims of almost 900 HRMs.  Essentially, after the close of discovery, the record is replete with significant contradictory testimony from Plaintiffs on the man issues to be tried.  Because of these differences, the proposed efficiencies in treating Plaintiffs' claims collectively at trial cannot be realized.  For these reasons, and the reasons set forth more fully below, Lowe's respectfully requests that the Court decertify the Plaintiffs' claims as a collective action under the FLSA, and dismiss the improperly joined Plaintiffs without prejudice.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Procedural History

On August 15, 2012, Plaintiff Lytle filed a collective action alleging that Lowe's willfully misclassified the HRM position as exempt and failed to pay overtime wages in violation of the FLSA. [DE 1 at ¶¶ 2-3][2] Plaintiff sought conditional certification of a class of "[a]ll [HRMs] or other Human Resources store employees with other titles, who are or were employed with Lowe's, within the past three years preceding this lawsuit to the day of trial,

---

[2] Plaintiff amended her complaint to add Lowe's HIW, Inc., Lowe's Companies, Inc., and the Administrative Committee of Lowe's Companies, Inc. as party Defendants [DE 76, 186, and 350] and amended the complaint to add three claims under the Employee Retirement Income Security Act ("ERISA").  [DE 186, 350]  On April 29, 2014, the Court granted Lowe's motion to dismiss the ERISA claims.  [DE 408]  Thus, only the FLSA collective action claim remains.

and elect to opt-in to this action pursuant to FLSA 29 U.S.C. Section §216(b) who have worked in excess of forty (40) hours per week and were not paid overtime wages." *Id.* at ¶ 13. On July 26, 2013, Plaintiff filed an amended motion to conditionally certify a nationwide collective action on her FLSA claim. [DE 205] Lowe's filed its opposition on August 21, 2013. [DE 221]

On January 10, 2014, the Court granted Plaintiff's amended motion and conditionally certified a nationwide collective action under the FLSA. [DE 340] In its ruling, the Court applied the "two-tiered procedure for district courts to follow in determining whether to certify a collective action under § 216(b)." [*Id.* at 4.] At the first step, known as the "notice stage," the Court conditionally certified a class under a "fairly lenient standard." [*Id.* at 5.] However, the Court did not consider Lowe's "contentions pinpointing variations in the performance of Human Resources Managers duties depending on the particular store, store manager, Area Human Resources Manager, Human Resources Manager's personal experience, or when the particular duties were performed." [*Id.* at 12.] Rather, the Court stated that Lowe's "arguments appear to be relevant to the application of various exemptions from the FLSA, which is more properly addressed after discovery is completed" at the decertification stage. [*Id.*]

After the Court-approved opt-in notice was mailed to potential class members, 891 former and current Lowe's HRMs (less than one third of the potential class) opted-in to the collective action as class members. When the notice period ended, the Parties began class discovery, including the exchange of tens of thousands of documents, emails, payroll records and other materials; the depositions of class members and corporate representatives; and

other actions necessary for the Parties to prepare their respective cases for pre-trial motions and possibly trial. As more fully documented below, the record developed during discovery shows significant differences in the duties performed by the Plaintiffs—differences that, as many courts have explained, preclude collective action treatment.  *See, e.g., Whineglass v. Smith*, 8:11-CV-2784-T-23TGW, 2013 WL 2237841 at *6 (M.D. Fla. May 21, 2013) ("the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action.") (decertifying collective action).

**B.      Lowe's And The HRM Position.**

Lowe's operates over 1,700 stores throughout the United States.  (A - Hastings ¶4)[3] The stores vary in size and number of employees.  Some stores employ less than 100 employees, while others employ over 200 employees.  *Id*.  Each store is managed by a SM, and typically has at least three to four ASMs.  (*Id*. ¶5)  The SM is responsible for the operations of the store, and is the highest ranking manager at each store.  *Id*.

Each Lowe's store also has a HRM and, depending on its size, may have a Human Resources Coordinator ("HRC").  (*Id*. ¶6)  The HRM is responsible for all human resources issues at the store.  *Id*.  As the HRM's job description explains, the HRM is "[r]esponsible for anticipating talent needs and addressing them through proactive and effective recruiting,

---

[3] All exhibits cited in this Motion are attached to the Notice of Filing Exhibits in Support of Lowe's Motion to Decertify Collective Action and Memorandum of Law in Support.  The declarations of numerous opt-in Plaintiffs submitted by Lowe's for the Court's consideration are organized alphabetically  in Exhibit "C," and are cited in this Motion by reference to Exhibit C, the Plaintiff's last name and the paragraph being referenced (for example: "C – Doe ¶1).  All of the declarations from HRMs cited in this Motion were submitted by opt-in Plaintiffs.  In addition, Lowe's is filing the declarations of some Area Human Resources Managers, which are appended at Exhibit "A," and are cited by reference to Exhibit A, the last name of the particular Area Human Resources Manager, and the paragraph number (for example: "A – Hastings ¶1").

staffing and training."  (Exh. B.)  The HRM is also expected to "[m]otivate and retain existing talent by anticipating human resource issues in the store through consistent and effective application of Lowe's policies, management practices, and legal requirements."  *Id.*

Beginning in early 2012, HRMs started reporting to an Area Human Resources Manager ("AHRM"), who may supervise more than 20 HRMs.  (A - Hastings ¶3)  Before early 2012, HRMs reported directly to their SMs.  *Id.*  Regardless of their reporting requirements, all HRMs are expected—and have been expected during all of the period covered by this lawsuit— to exercise authority over and be the experts on personnel issues at their stores.  (*Id.* ¶6)  These issues include selecting candidates for interviews, hiring new employees, promoting and evaluating employees, disciplining and terminating employees, investigating complaints of discrimination and harassment, and determining store staffing levels.  *Id.*; (A - Seaver ¶¶5-6, 8, 11-12; A - Seifried ¶¶4-5, 7.)[4]

### III.    ARGUMENTS AND AUTHORITIES

**A.    Plaintiffs' Burden Of Proving They Are Similarly Situated At The Decertification Stage In A Manager Misclassification Case Is "Stringent."**

Section 216(b) of the FLSA permits a plaintiff to seek unpaid overtime compensation on behalf of herself "and other employees similarly situated."  29 U.S.C. § 216(b).  Under the Eleventh Circuit's two-tiered approach for determining if a FLSA case may be tried as a collective action, the Court first determined at the notice stage that "notice of the action should be given to potential class members."  [DE 340]; *Hipp v. Liberty Nat'l Life Ins. Co.,*

---

[4] Seaver and Seifried are both AHRMs who supervise (and have supervised during the class period) a number of HRMs.

252 F.3d 1208, 1218 (11th Cir. 2001).  The Court's determination to conditionally certify a class was "made using a fairly lenient standard."  *Id*.

Courts make the second determination when defendant files a motion for decertification, which is "usually filed after discovery is largely complete and the matter is ready for trial."  *Id*.  As one court recognized, the "second stage generally is where the rubber meets the road."  *Pickering v. Lorillard Tobacco Co.*, 2:10-CV-633-WKW, 2012 WL 314691, at *7 (M.D. Ala. Jan. 30, 2012).  At the decertification stage, the district court is required "to re-evaluate the 'similarly situated' requirement and make a factual determination based on all the evidence in the record."  *Cohen v. Allied Steel Bldgs., Inc.*, 554 F. Supp. 2d 1331, 1333-34 (S.D. Fla. 2008).  This includes all evidence previously filed with the Court during the notice stage, such as declarations from Plaintiffs and non-opt-in Lowe's HRMs, as well as subsequent depositions and discovery responses.[5]

Because the district court has a much thicker record than it had at the notice stage, at the decertification stage, it can make a more informed factual determination of similarity.  *Whineglass*, 2013 WL 2237841, at *6; *Aquilino v. Home Depot, U.S.A., Inc.*, CIV.A. 04-04100 PGS, 2011 WL 564039, at *7 (D.N.J. Feb. 15, 2011).  Plaintiffs' standard to show

---

[5] *See Craig v. Rite Aid Corp.*, 4:08-CV-2317, 2012 WL 279647, at *5 (M.D. Pa. Jan. 31, 2012) ("when considering whether to decertify a collective action, district courts must evaluate the totality of the evidence and circumstances that may bear upon the suitability of a particular action to proceed collectively"); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 570 n.2 (E.D. La. 2008) ("Because plaintiffs alleged that Big Lots maintained a corporate policy and practice of misclassifying the ASM job position that was applicable nationwide to all ASMs, the Court determined that evidence about the employment experiences of non-opt-in ASMs who held the same job position as the opt-in plaintiffs was relevant to the parties' claims and defenses.").

7

substantial similarity is more stringent and rigorous, and they bear a heavier burden of showing they are similarly situated.  *Id.*

**B.     Plaintiffs Cannot Carry Their Burden Of Showing They Are Similarly Situated Under The Stringent And Rigorous Three Factor Test.**

Courts in the Eleventh Circuit state that the three factors in determining "similarity at the decertification stage are (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations."  *Whineglass*, 2013 WL 2237841 at *6.  These three factors "are not mutually exclusive—there is considerable overlap among them. Each factor directly influences the others."  *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1234 (N.D. Ala. 2012).  As one court noted in a manager misclassification case, the "extent to which opt-in plaintiffs' work experiences differ directly influences [defendant's] capacity to prove its statutory exemption defense.  In that sense, the first two factors are like two sides of the same coin."  *Johnson*, 561 F. Supp. 2d at 574.  Thus, based on consideration of these three factors, "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action."  *Whineglass*, 2013 WL 2237841 at *6; *Anderson v. Cagle's*, 488 F.3d 945, 953 (11th Cir. 2007).  Here, Plaintiffs cannot carry their stringent burden because the record is replete with "material distinctions revealed by the evidence."  *Id*.  Given this record, determining whether Plaintiffs were properly classified as exempt employees will require a fact-specific, individualized assessment of each Plaintiff's actual duties.  Such individualized assessments are not suitable for collective action treatment.  This is particularly true where the "similarly situated"

standard must be examined through the lens of the administrative exemption test.  *See, e.g.,*

*Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012).

> **1.      The Administrative Exemption Is Fact-Specific And Will Require Individualized Analysis Of Each Plaintiff's Duties.**

Lowe's bears the burden of establishing that the administrative exemption applies to

each Plaintiff.  *Atlanta Prof'l Firefighters Union, Local 134 v. City of Atlanta*, 920 F.2d 800,

804 (11th Cir. 1991); *Carlson v. C.H. Robinson Worldwide, Inc.*, CIV 02-3780 JNE/JJG,

2006 WL 2830015, at *3 (D. Minn. Sept. 26, 2006).  To carry its burden, Lowe's will have to

show that Plaintiffs' (1) compensation was paid on a salary basis of at least $455 per week,

(2) primary duty is the performance of office or non-manual work directly related to the

management or general business operations of the employer or the employer's customers,

and (3) primary duty includes the exercise of discretion and independent judgment with

respect to matters of significance.  29 C.F.R. § 541.200(a)(1)-(3); *Hodge v. ClosetMaid*

*Corp.*, 5:13-CV-62-OC-10PRL, 2014 WL 1328967, at *6 (M.D. Fla. Apr. 2, 2014).

The Department of Labor ("DOL") has issued detailed regulations that flesh out

these elements.  For instance, the term "primary duty" means "the principal, main, major or

most important duty that the employee performs." 29 C.F.R. § 541.700(a).[6]  In assessing this

factor, the "amount of time spent performing exempt work can be a useful guide in determining

whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b); *Carlson*,

---

[6] Under the DOL's implementing regulations, the factors a court must consider when determining the primary duty of an employee include: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*

2006 WL 2830015 at *4.  While spending over 50 percent of their time performing exempt work will generally satisfy the primary duty requirement (29 C.F.R. § 541.700(b)), courts and the DOL have consistently made clear that spending as little as 10 percent (or less) of the employee's time on exempt matters may suffice to meet the "primary duty" test.  *See, e.g., Jones v. Virginia Oil Co.,* 69 Fed.Appx. 633 (4th Cir. 2003) (manager of Dairy Queen and convenience store exempt although she spent 75-80% of her time performing tasks such as cooking, cleaning and operating the cash register because, while performing the non-exempt tasks, she was simultaneously performing managerial tasks); *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104 (9th Cir. 2001) (managers at recreational vehicle park who spent 90% of time performing non-exempt work considered exempt); *Murray v. Stuckey's Inc.,* 939 F.2d 614 (8th Cir. 1991) (managers who spent 65-90% of their time performing non-exempt work were nonetheless exempt); *Moore v. Tractor Supply Co.,* 352 F. Supp. 2d 1268 (S.D. Fla. 2004) (manager of retail establishment who spent 95% of his time performing non-exempt tasks held to be exempt).  Thus, standing alone, time spent on exempt work is not determinative.

The regulations advise that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).  Factors that a court must consider in making this determination include:

> the relative importance of the exempt duties as compared with
> other types of duties; the amount of time spent performing

10

exempt work; the employee's relative freedom from direct
supervision; and the relationship between the employee's
salary and the wages paid to other employees for the kind of
nonexempt work performed by the employee. *Id.*

The DOL and the courts make clear, however, that under the administrative
exemption, an employee does not have to be the final decision-maker.  It is enough that the
employee make recommendations on important matters, even if these recommendations are
reviewed and ultimately decided at a higher level.  *See* 29 C.F.R. § 541.202(c) ("decisions
made as a result of the exercise of discretion and independent judgment may consist of the
recommendations for action rather than the actual taking of action"); *see e.g., Farnham v.
RIIMIC, LLC*, No. 12-60153-CIV, 2012 WL 5187851, at *4 (S.D. Fla. Oct. 19, 2012)
("While an administrative employee must exercise independent decision-making, the fact
that her superiors must review and approve the employee's decisions before they are final
does not disqualify the employee from the administrative exemption.").

In light of these factors, this District recognizes that the "determination of whether an
employee is exempt under the FLSA is a fact intensive inquiry."  *Rock v. Sunbelt Cranes,
Const. & Hauling, Inc.*, 678 F. Supp. 2d 1264, 1270 (M.D. Fla. 2009).  This is certainly true
in manager misclassification cases, as the "focus of whether an employee is properly
classified under the administrative exemption requires an individualized inquiry into a
Plaintiff's day-to-day job responsibilities and tasks."  *Green*, 888 F. Supp. 2d at 1103; *Reyes
v. Texas Ezpawn, L.P.*, CIV.A. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007)
(assessing the relevant criteria under the administrative exemption "will require an
individual, fact-specific analysis of each [assistant store manager's] job responsibilities").  In
*Carlson*, 2006 WL 2830015 at *10, the court recognized that "the administrative exemption

will be the dominant issue at trial.  The regulations summarized above reveal that a fact-intensive inquiry determines whether the administrative exemption applies to an employee." Faced with this inquiry, the court decertified a manager misclassification collective action because of the variances in the "factual and employment settings" of the plaintiffs.  *Id.*[7]

Similarly, this case will require the Court to analyze the duties actually performed by almost 900 Plaintiffs.  As Plaintiffs' expert acknowledges, the focus of the trial will be on the third factor of the administrative exemption test—the extent to which each Plaintiff exercises independent judgment and discretion in his or her position.[8]  Essentially, the focus will be on whether Plaintiffs decided or influenced (made recommendations that were given weight) on issues such as recruiting and hiring, disciplining and terminating employees, and investigating personnel issues.[9]  As set forth more fully below, the record evidence shows significant differences in the amount of discretion and independent judgment exercised by Plaintiffs in matters of significance, such as recruiting, hiring, promotions, investigations, discipline, and supervision.  The record also shows significant differences in the exercise of independent judgment and discretion by Plaintiffs depending on their relationship with a SM

---

[7] *See also Johnson*, 561 F. Supp. 2d at 574 (court decertified a collective action because "an analysis of the exemption/misclassification issue is highly fact-intensive, given the multiplicity of factors that the Department of Labor's regulations require a court to consider in determining whether an employee is properly classified in light of his or her actual job duties").

[8] Plaintiffs' expert concluded that Lowe's met the salary test for the administrative exemption (Exhibit "D" at 8), and that Plaintiffs' primary duties consisted of "office and non-manual duties related to the personnel areas of personnel management, human resources, employee benefits, and labor relations."  (*Id.* at 13.)  He disagreed with Lowe's position (including the conclusion of Lowe's expert), however, on whether Plaintiffs' work required the use of discretion and independent judgment.  (*Id.* at 21.)

[9] The DOL has already determined that these areas (recruiting, hiring, investigating complaints and disciplining) constitute matters of significance for companies.  29 C.F.R. § 541.201-203.

or AHRM, the sales volume of the store, the time of year, and the location of the store. These factors render collective action treatment untenable.  *See, e.g., Whineglass*, 2013 WL 2237841.

> **2.     Plaintiffs Exercise Varying And Distinct Degrees Of Independent Judgment And Discretion Based On Their Disparate Factual and Employment Settings.**

The first consideration in the decertification analysis is to weigh the "disparate factual and employment settings of the individual plaintiffs."  *Whineglass*, 2013 WL 2237841 at *6. The Court must consider whether Plaintiffs had the same job title; "worked in the same geographic location;" "alleged violations occurred during the same time period;" "were subjected to the same policies and practices" and by the same or different decision-makers; and the extent to which the alleged FLSA violations are similar.  *Whineglass*, 2013 WL 2237841 at *7.[10]  Plaintiffs acknowledge that different factual settings, especially the management style of their supervisors (whether the SM or the AHRM) and the size and sales volume of their stores, have a significant impact on the amount of discretion they exercise.[11]

---

[10] In their motion for conditional certification, Plaintiffs emphasized that Lowe's uses the same job description in all stores.  This fact, however, is of little consequence at this second stage: "Plaintiffs may not rely on the job description itself as generalized evidence of the scope and similarity of their daily activities."  *Green*, 888 F. Supp. 2d at 1099 (quoting 29 C.F.R. § 541.2).  Rather, "the Court must conduct a fact-intensive inquiry into the daily activities of each individual plaintiff in order to adequately identify the actual scope of Plaintiffs' job duties to determine the extent and consequences of any disparities among them."  *Id*.  Plaintiffs themselves admit that the job description is of little importance or relevance to their daily duties.  (Murphy Depo. 105-106; Seguinot Depo. 165.)

[11] The deposition testimony of various Plaintiffs is cited in this Motion by reference to the Plaintiff's last name and the page number(s).  The transcript of each deposition referenced in this Motion is being filed simultaneously with this Motion.

### a.      Relationship With SM or AHRM

Plaintiffs acknowledge that the influence and discretion they exercise varies,

sometimes significantly, based on the relationship between the HRM and his or her SM or

AHRM.  For example, Plaintiff Seguinot testified that one of his AHRMs did not care for his

opinion, while another AHRM sought his input and valued his opinion:

> Q.      …Do you know if they [the AHRMs] took your
> opinion, your recommendations into consideration, if you
> know?
>
> A.      Let's do a comparison.  I don't think Stephanie Sage
> [an AHRM] cared about what my opinion was.  I think more in
> the Philadelphia area Karen Ortley [another AHRM] was more
> the type of person that would say, what do you think, Robert?
> Where do you think we need to go here?
>
> She was more open, yet she would still make the final
> decision on it.  But she would—it seemed like she would be the
> person that would listen and accept your opinion and then go
> forward.

(Seguinot Depo. 136.)[12]  Plaintiff Murphy likewise noted the differences in the way an

HRM's opinion was considered, depending on the management style of particular AHRMs:

> Q.      Do you think he or she [AHRM] took your opinion into
> consideration?
>
> A.      Most of them, yes.  There were some that I did not, but
> there were some that I would say yes.

(Murphy Depo. 33.)  As even Plaintiff Lytle admitted, such differences could be substantial:

> Q.      Was his [Mr. Theo Weaver's] management style
> different than Mr. Sangar's [a prior SM]?

---

[12] The fact that the AHRM made the ultimate decision does not defeat the application of the administrative exemption if, as Seguinot acknowledges, she took his opinion into consideration. *See* 29 C.F.R. § 541.202(c); *see, e.g., Farnham*, 2012 WL 5187851, at *4.

14

> A.      Theo [a SM] was very involved.  He liked to be
> involved in all the decisions.  Mr. Sangar didn't want to take
> any responsibility.  Everything went by Theo.
>
> Q.      Well, you said when Mr. Sangar was a store manager at
> the store that you worked, he wouldn't really get involved in a
> lot of decisions?
>
> A.      No.  He—he didn't want to.
>
> Q.      Where Mr. Weaver was very involved in decisions?
>
> A.      In everything.

(Lytle Depo. 51-52.)[13]

Plaintiffs acknowledge that these differences in management style impacted their

ability to make or influence important decisions.  Some Plaintiffs declared that their SMs and

AHRMs made *all* decisions for anything affecting the store, including all human resources

issues.  Plaintiff Lytle, for example, testified that she was never allowed to make decisions

and her recommendations were never considered, especially by Weaver (one of her SMs) and

Hastings (one of her AHRMs).  (Lytle Depo. 48-52, 129, 134-35, 157; *see e.g.,* C - Coffey

¶15; C - Lewis ¶17.)  As a result, these Plaintiffs were apparently severely limited or

prohibited outright from even influencing decisions.  (*Id.*)

Other Plaintiffs, however, experienced a completely different relationship with their

SM or AHRM, and were as a result able to make or at least influence significant decisions.

Plaintiff Chambers, for example, declared that the four SMs he worked for were hands-off

---

[13] *See also* Bolton Depo. 28 (current AHRM does not push him to be on the floor like past
AHRMs);  Kelley Depo. 17-18, 20-22 (one SM thought HRM job was paperwork driven
while other gave Plaintiff freedom to make her own schedule), 32 (one AHRM was more
policy driven than other); Seguinot Depo. 136-137, 167 (different AHRMs provided more
oversight and valued opinion in investigations); (A - Hastings ¶¶8-9; A - Seaver ¶14; A -
Seifried ¶8).  Experience level also made a difference.  (A - Seaver ¶14.)

and "generally do not get involved in the majority of human resources decisions but allow me the freedom generally to run the department."  (C - Chambers ¶13.)  Other Plaintiffs similarly reported having "hands off" SMs and AHRMs, who allowed them to make or influence significant decisions.  (C - Avena ¶14.)

> **b.**     **Level of Experience**

The level of experience of the HRM and of the SMs or AHRMs also impacts the amount of discretion HRMs exercise.  Less experienced HRMs may seek more guidance and input from AHRMs, thus limiting their discretion.  (A - Seaver ¶14; A - Seifried ¶9.)  On the other hand, Plaintiff Otter has a "strong and longstanding relationship with the Store Manager," so she is "given significant responsibilities and discretion in the formulation of staffing plans," as the SM relies on her experience and "long tenure." (C - Otter ¶¶10, 14.)

The level of experience of the HRM and of the SMs or AHRMs also impacts the amount of discretion HRMs exercise.  Less experienced HRMs may seek more guidance and input from AHRMs, thus limiting their discretion.  (A - Seaver ¶14; A - Seifried ¶9.)  On the other hand, Plaintiff Otter has a "strong and longstanding relationship with the Store Manager," so she is "given significant responsibilities and discretion in the formulation of staffing plans," as the SM relies on her experience and "long tenure." (C - Otter ¶¶10, 14.)  In turn, Plaintiff Avena, an HRM with thirty years of human resources experience, believes she has the ideal relationship with her SM who "will not make any HR decisions without conferring with the HRM," because he "respects my experience." (C - Avena ¶14.)

### c.     Location and Sales Volume

Similarly, the location and sales volume of a Lowe's store impacts differently, and sometimes significantly, how Plaintiffs spend their time.  Plaintiff Murphy, for example, acknowledged that she did not spend as much time on recruiting as other HRMs because her store in Buford, Georgia had a strong application flow.  (Murphy Depo. 46-48.)  Also, the store in Athens, Georgia, where she once worked, had a higher sales volume, which allowed the HRM there to have a part-time coordinator to assist on administrative tasks.  (Murphy Depo. 75.)[14]  Plaintiff Hoff declared that the customer base at the Lady Lake store in Florida is older than at the Ocala store where she worked, and gets more traffic from customers who need assistance, so she and the SM  "determined that the store needs an increase in staffing to address these issues."  (C - Hoff  ¶3.)  Plaintiff Avena, in turn, stated that the pace at the McMinnville, Tennessee store was slower, as it is a "small, sleepy town with a small customer base," and those employees "need more hands-on assistance than the employees in Smyrna," where the pace is much faster.  Thus, he spent more time on the sales floor in McMinnville. (C - Avena ¶¶6-9.)  Plaintiff Kelley similarly testified that store staffing plans differed depending on the volume of the store:

> Q.     So depending on the number of employees in a store or the volume of sales in a store, there would be more or less staffing decisions that were made?

---

[14] Some larger stores employ a HRC, who is supervised by the HRM and handles most of the human resources paperwork.  (C - Tinaza ¶18; C - Welsh ¶14.)  HRMs who supervise HRCs perform little or no clerical work.  (*Id.*)  Indeed, some HRMs report that they have performed different amounts of clerical work the last few years depending on whether they supervised a HRC.  (C - Avena ¶18; C - Richardson ¶22; C - Welsh ¶14.)  Additionally, given the need to advise management on personnel issues and counsel employees, HRMs at stores with more employees may not be able to spend much time (if any) "walking the floor," providing customer service, or handling non-administrative matters.  (C - Otter ¶12.)

A.      Correct.

(Kelley Depo. 45.)

This acknowledgment by many Plaintiffs that, in their experience, the size and location of the store impacts their duties counsels in favor of decertification. *Reyes*, 2007 WL 101808 at *4 ("The location of a store often dictated the volume of business and the number of employees, thereby affecting an ASM's workload and responsibility.") The testimony of Plaintiffs shows that the influence Plaintiffs exercise over and the amount of time they spend on important duties, such as recruiting, interviewing, and hiring, depends on factors such as the HRM's relationship with the SM or AHRM, their relative level of experience, the sales volume of the store, the time of year, and the location of the store.[15] Courts have found that these disparate factual and employment settings are enough to justify decertification. *See Green*, 888 F. Supp. 2d at 1101, 1103 (decertifying class where evidence showed "lack of uniformity among [SMs] with respect to how much control District Managers exercised over Store Managers and how much discretion they were afforded in their management tasks"). *See also Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1129 (N.D. Cal. 2011) (decertifying manager misclassification case where evidence "shows that the job duties of managers varied significantly across silos" nationwide);

---

[15] Many Plaintiffs admit that their duties and the amount of time spent on them also vary depending on the time of year and season. (C - Avena ¶32; C - Chiavaroli ¶12; C - Welsh ¶4.) ("What I do each day in my job has varied from store to store and also from season to season."); *see also* C - DeRoche ¶¶11, 13; C - Medina, P. ¶12; C - Richardson ¶21. A number of HRMs declared that, because spring is the busy season for Lowe's, they created staffing plans for spring hiring, which the SM adopted because of their experience, and at the end of the season, some of them worked with the SM on a plan for letting go of the seasonal employees. (C - Avena ¶32; C - Medina, P. ¶12.) On the other hand, Plaintiff Lytle testified that she played no role in determining the number of employees to bring in during peak seasons. (Lytle Depo. 84-85.)

18

*Aquilino*, 2011 WL 564039 at *9 (decertifying class where "deposition evidence clearly establishes that MASM job responsibilities and duties varied from MASM to MASM, from store to store, from shift to shift, and in some cases from subordinate employee to subordinate employee"); *Reyes*, 2007 WL 101808 at *4 (decertifying class where "Plaintiffs' deposition testimony . . . reveals significant differences in each ASM's job duties, discretion, and authority, depending on the practices of individual store managers, store demographics, and location").  This Court should do the same and decertify the class here.

### 3.      Individual Defenses Will Apply to Each Plaintiff.

The second element of the Eleventh Circuit decertification test is the examination of "the various defenses available to defendants that appear to be individual to each plaintiff." *Whineglass*, 2013 WL 2237841 at *6.  As even Plaintiffs' expert acknowledges, the determination of Lowe's main defense in this case—that Plaintiffs were exempt under the administrative exemption—hinges on whether Plaintiffs exercised independent judgment and discretion.  (Exh. "D" at 21.)  After the close of discovery, the record—including dozens of declarations, tens of thousands of documents, the deposition testimony of selected Plaintiffs, and the admissions of Plaintiffs in resumes and similar documents—shows significant, individualized differences in the amount of discretion and independent judgment exercised by Plaintiffs.  In fact, just the deposition testimony of Plaintiffs on this issue creates such significant differences so as to defeat any attempt at collective action treatment.  Lowe's analyzes in this section those stark differences by describing the evidence (mainly Plaintiffs' own admissions) concerning the discretion exercised by Plaintiffs when performing their main duties.

### a.      Staffing, Recruiting and Hiring

As Plaintiffs acknowledge, hiring employees (making sure the company attracts and hires the best work force) is of great importance to Lowe's.  (Murphy Depo. 41-42; Kelley Depo. 8.)[16]  The recruiting and hiring process is divided into phases and components, some of which overlap.  First, management must determine the appropriate staffing levels.  (Kelley Depo. 37, 41-51; Murphy Depo. 34-38, 45.)  At the same time, Lowe's must attract (recruit) a pool of qualified and diverse applicants.  (Murphy Depo. 45-53.)  It must then select, usually from a large group of applicants, the most qualified candidates for final interviews.  (Seguinot Depo. 39.)  Finally, it must interview the final candidates and, from this group of finalists, make the final hiring decision.  (Seguinot Depo. 219-20.)  This process is critical to the success of a store, and is, thus, a critical responsibility of HRMs:

> Q.      And you would agree . . . that hiring decisions of the store are a critical decision of great importance to a store?
>
> A.      Yes.

(Lytle Depo. 118.)

As Plaintiffs acknowledge, the amount of discretion and independent judgment they exercise in these areas and phases vary significantly.  As shown below, some Plaintiffs claim that they make no decisions and have no influence in these decisions.  Other Plaintiffs, however, acknowledge that they exercise a great degree of influence and discretion in these areas—from influencing staffing levels at the store, to being the sole decision-maker on

---

[16] The DOL considers personnel management and human resources to be work directly related to management or general business operations.  29 C.F.R. § 541.201.

recruiting efforts and on the selection of the final applicants, to having as much as 50 percent of the input on almost all final hiring decisions.

### i.      Deciding Staffing Levels

Each Lowe's store is required to determine its staffing level, including the total number of employees, the ratio between part-time and full-time employees, and their allocation by department.  (Kelley Depo. 41-43.)  While some of these decisions are dictated at the corporate level, they must be adjusted and finalized based on the store's needs and experience.  (*Id.*)  Some Plaintiffs contend that they play little or no role in determining the staffing levels at their stores.  Plaintiff Lytle, for example, testified that she played "no role" in staffing decisions, including the number of employees at the store, the department where they would be allocated, and the ratio between part time and full time employees:

> Q.      Okay.  And did you have any role in those decisions?  I'm going to call those staffing decisions, to be clear.
>
> A.      No, the part-time and full-time ratio, if I am not wrong, they gave us those numbers.
>
> * * *
>
> A.      Again, I want to be clear on this.  Let's go through that.  You had no role in determining what the ratio of part-time to full-time was at your store?
>
> A.      No, it was given to us already.
>
> Q.      And with respect to how many actual people to hire, the number of people to hire, did you have any role in that process?
>
> A.      No, because I didn't know.  I didn't work on the floor so I didn't know what the need was.

> Q.      And with respect to the departments where they would be located and how to allocate people, did you have any role in that decision?
>
> A.      No.
>
> Q.      When I say "role," did you make recommendations, did the store manager consult with you, ask your opinion, anything of that sort?
>
> A.      No, because I don't work on the floor so I don't know what the need is.  I don't know what department is needing people or any of that.  I am told how many people to bring on board.

(Lytle Depo. 74-75.)

A number of Plaintiffs, however, expressly contradict Lytle.  As they explain, before posting an open position for hiring, HRMs and SMs often *decide together* the staffing plan for the store.  (A - Seaver ¶6; C – Avena ¶32; C - Chiavaroli ¶10; C - DeRoche ¶11; C - Drake ¶10; C - Medina, P. ¶11.) They review data, project needs, and recommend staffing levels.  *Id.*  In fact, Plaintiff Kelley testified that she, as the HRM, was closely involved with others in her district in deciding the level of staffing:

> Q.      But you would all as a district get together and sort of in a collaborative way figure out what your staffing would be for the spring in each of the stores?
>
> A.      Correct.
>
>         That is, you were part of this collaborative decision-making process where you talked through the issues and decided what the staffing mixes would be?
>
> A.      Yes.
>
> Q.      And you knew that there were more decisions that had to be made for the bigger, higher volume stores?
>
> A.      Yes.

* * *

> Q.      That is, first you have to make decisions, you, the store manager, the HRM, the area [AHRM] would all have to talk about staffing up for the spring?
>
> A.      Right.
>
> Q.      And then you have to make similar decisions for sort of ramping down, if you will?
>
> A.      Right.
>
> Q.      And those decisions were made in the same manner as you described before, correct?
>
> A.      Yes.
>
> Q.      That is, the district, the HRM, the area [AHRM], the store manager, correct?
>
> A.      Yes.
>
> Q.      All involved in that sort of collaborative decision-making process?
>
> A.      Yes.

(Kelley Depo. 45, 47-48.)[17]

Other opt-in Plaintiffs similarly declared that they were "given significant responsibilities and discretion in the formulation of staffing plans" (C - Otter ¶10) and were "deeply involved in making staffing-level decisions."  (C - Chiavaroli ¶10; C - DeRoche

---

[17] The fact that Kelley collaborated on the final staffing decisions, rather than made the decision alone, does not defeat the application of the administrative exemption.  *See* 29 C.F.R. § 541.202(c) ("decisions made as a result of the exercise of discretion and independent judgment may consist of the recommendations for action rather than the actual taking of action").

¶11).[18]  And, their staffing recommendations were often accepted as final by their SMs.  (C - Avena ¶32; C - Tinaza ¶15.)  The record, thus, reveals sharp differences in the discretion actually exercised by Plaintiffs in deciding the staffing levels (the number of people to be hired) at their stores—from Lytle's "no role" to other Plaintiffs' "deep involvement" and actual participation in these decisions.

### ii.    Recruiting

Management at Lowe's stores not only creates staffing plans, but must actively recruit in the community to attract the best applicant pool.  (C - Avena ¶¶19-20.)  As part of these efforts, Lowe's emphasizes and promotes diversity.  Through its Good Faith Efforts, Lowe's partners with community groups to try to attract a diverse group of applicants.  As many Plaintiffs acknowledge, promoting diversity is a very important goal for Lowe's. (Kelley Depo. 38; Bolton Depo. 48; Seguinot Depo. 47.)  Plaintiffs, however, differ markedly in their involvement and decision-making in this community recruiting and outreach effort.  Plaintiff Lytle, for example, claims that she did little or no outreach to groups and organizations in the community, never researched or selected groups for such outreach, and merely sent e-mails to some groups to fulfill a requirement.  (Lytle Depo. 79-81.)  Plaintiff Murphy also did not engage in much outside recruiting because she already had a strong applicant flow.  (Murphy Depo. 46-48.)

Other Plaintiffs, however, explained that they exercised significant discretion in this area, including deciding what groups to visit and how to recruit a diverse workforce. Plaintiff Bolton, for example, explained her role in this area:

---

[18] *See also* C - Avena ¶32; C - Drake ¶9 ("I also exercise independent judgment in store staffing matters."); C - Tinaza ¶4.

> Q.      Are you aware of or are you familiar with the concept of good faith efforts?
>
> A.      Oh, yes, sir.
>
> Q.      How do you define that?
>
> A.      That is where we are going out and we are making good faith efforts to make sure we are getting a diverse work group and that everyone gets an opportunity at Lowe's, whether they are race, age, disability, creed, national origin.
>
> A.      Who manages the good faith efforts at your store?
>
> A.      I do.

(Bolton Depo. 57).  (*See also* Seguinot Depo. 42, 45, 48; C - Avena ¶20-22; C - Chiavaroli ¶4; C - Sweeney ¶15.)  All of these Plaintiffs agreed that such community outreach and external recruiting, which are part of Lowe's diversity efforts, is of significant importance to the company.  (Kelley Depo. 38; Bolton Depo. 48; Seguinot Depo. 47.)

### iii.      Selection of Final Candidates

Before applicants are brought to the store for final interviews, HRMs post any open positions online and, after the applicants who don't meet minimum qualifications are sorted out by a computerized process, review all of the applications that meet the minimum qualifications for the particular position.  (A - Seaver ¶8; A - Seifried ¶10.)  As even Plaintiff Lytle acknowledged, the store is sometimes left with as many as 90 eligible applicants for one position.  (Lytle Depo. 89-90.)  And, it is the HRM's responsibility to determine, from these dozens of applicants, who will be brought in for final interviews.  (Murphy Depo. 59-60.)  A few Plaintiffs, however, stated that they make no decisions during this initial selection process, or make the decisions without exercising any actual judgment.  Plaintiff

Lytle, for example, testified that she simply selected the first few "approved" candidates to bring in for interviews without any assessment of their qualifications:

> Q.      And you have to decide which of those 90 [applicants] are going to be brought back in for interviews?
>
> A.      No.  I have to pick the application, show it to the store manager, and the store manager tells me who I bring.
>
> Q.      All right. Let's go through that.  So, you have 90 that were eligible, right?
>
> A.      Yes.
>
> Q.      You would bring all 90 to the store manager?
>
> A.      No.  I will just say, oh, let me choose this application and this one and this one.
>
> Q.      Okay.  And how would you select those?
>
> A.      The first ten or five greens[19] that I see in the screen.
>
> Q.      You would make no other effort?
>
> A.      No.
>
> Q.      You wouldn't go in and say, okay, this one has better experience; these are the five that I think [have] the best experience for this position?  You would not do that?
>
> A.      No.  Because when it's cashier, we can have people without experience, just out of college—out of high school. The same thing with customer service associates.  We can hire

---

[19] As Plaintiffs explain, before they review the applications, a computer program codes each application green, yellow, or red based on the candidate's scores in an assessment test, as well as on whether they meet basic minimum requirements.  (Lytle Depo. 87-89.)  All applicants who do not meet a minimum score on the assessment or do not meet an objective requirement (for example, are under 18 years old) are coded red, which means they cannot be considered further.  (*Id.*)  The others are coded either green (can be considered) or yellow (may be considered, but be cautious).  (*Id.*)  As Plaintiffs explain, after this coding is completed, they must still select from dozens of remaining green or yellow applicants.  (Lytle Depo. 87-88) (not uncommon to have 90 resumes eligible for consideration).

> whoever.  We don't need to select.  When it is appliances or
> specialist positions, the number of applicants were so minimum
> that pretty much we brought everybody.

(Lytle Depo. 90-91.)  Essentially, she claims that she exercised no discretion and made no

decision during this initial selection process.  *(Id.)*

Contrary to Lytle's testimony, many Plaintiffs explain that they alone decide, from

among the dozens of eligible candidates, which applicants to bring in for final interviews,

with no input or supervision from anyone else.  As Plaintiff Drake declared, "For all jobs at

the store, I am the person that reviews all of the applications, selects the candidates to be

interviewed, and interview all those applicants who make it to the interview process. I

exercise substantial influence over the hiring process, as it all starts with me." (C - Drake ¶4.)

Plaintiff Bolton similarly explained:

> Q.    And then, for example, from the 15 [applicants] that are
> green [who meet minimum qualifications], you come down and
> you say, okay, these are the five that I believe as the HRM are
> the top five that we should bring back?
>
> A.    Yes.
>
> Q.    That's your decision alone?
>
> A.    Yes.
>
> Q.    And you use your judgment, your criteria, your good
> sense, your experience, in order to make that cut, in this
> example, from 15 to five?
>
> A.    Yes.
>
> Q.    Nobody tells you who those five are going to be?
>
> A.    No.

(Bolton Depo. 72)[20]

Given this testimony, the record in this critical area—what handful of applicants, from the dozens who apply and are eligible for consideration, will actually be interviewed—shows extreme contrasts. From Lytle's contention that she makes no decision in this area, to Bolton's admission that she uses "[her] judgment, [her] criteria, [her] good sense, and [her] experience" to make these decisions without input from anyone else, the contrasts in the range of discretion exercised by Plaintiffs is striking and sharp, precluding classwide determinations on this critical issue.

### iv.   Final Interviews and Hiring Decisions

After the final candidates are selected, typically by the HRM, they are brought to the store for final interviews.[21] These final selection interviews are conducted by the HRM and one high-level manager, either the SM or an ASM. (C - Avena ¶¶26-27.) Sometimes the HRM and the other manager conduct these interviews separately, and other times they interview the candidates together. (Seguinot Depo. 76-77.) In all instances, they must ask a number of questions that are pre-scripted, but must then give the answer to each question a

---

[20] *See also*, Murphy Depo. 57; Kelley Depo. 74-75; Seguinot Depo. 37, 39; Bolton Depo. 69-72; C - Avena ¶¶23-24; C - Chambers ¶2; C - Chiavaroli ¶5; C - DeRoche ¶5; C - Hoff ¶8; C - Medina, P. ¶4; C - Mott ¶5; C - Otter ¶4; C - Richardson ¶4; C - Tinaza ¶6; C - Welsh ¶6.

[21] Under Lowe's policy, management must interview at least two more individuals than the number of open positions. For example, if the store is hiring one Customer Service Associate, at least three applicants must be interviewed. (A - Seifried ¶10; A - Hastings ¶11.) However, a number of Plaintiffs declared that they have authority to interview more than the minimum required, and frequently do. (Kelley Depo. 69-70; C - Chambers ¶2; C - Drake ¶5 ("I have discretion to bring in more candidates than the minimum, and often decide to do that"); C - Medina, P. ¶5; C - Mott ¶5; C - Richardson ¶3 (using his discretion, will "select additional candidates for interview that I view to be qualified or otherwise a good fit for the position"); C - Tinaza ¶7.) This is in contrast to Plaintiffs' expert, who stated that HRMs had no authority to "determine the number of applicants to be interviewed." (Exh. "D" at 15.)

score.  (*Id.* at 77-78.)  Both managers, including the HRM, must give an independent score to each answer.  (*Id.*)  The scores are then added or averaged, and the candidate with the highest score is almost always selected.  (Lytle Depo. 106.)

Some Plaintiffs claim that they exercise no authority or discretion during this hiring process.  (C - Bell ¶¶18, 20-21, 26; C - Chisolm-Petties ¶15; C - Wong ¶¶19, 21-22, 26, 29.)  They claim that they have no discretion in the score they award to each question.  (Lytle Depo. 100) ("When you do an interview, you don't make a decision; you follow guidelines.")  They also claim that their SM makes all hiring decisions, with little or no input from the HRM.  As Plaintiff Lewis declared, "my opinions on who to hire are not given any weight or asked for."  (C - Lewis ¶21.)

Other Plaintiffs, however, acknowledge that they play a substantial role in the ultimate hiring decisions.  For example, many Plaintiffs explain that the score they give the applicant requires them to exercise independent judgment.  Plaintiff Chambers explains that: "As the answers will necessarily vary upon the applicant, the score I give is left to my discretion."  (C - Chambers ¶3.)  Plaintiff Murphy, similarly, testified that she used her independent judgment in giving her score and that nobody told her how to score each question:

> Q.     You score what's your individual, independent decision?
>
> A.     Correct.
>
> Q.     That is, nobody was telling you what score to give?
>
> A.     Correct.

(Murphy Depo. 67.)  *See also* (Bolton Depo. 82, 96-97.)

After the interviews are concluded, the person with the highest combined score is almost always selected for hiring.  (C - Coffey ¶20.)  That is, the score given by the HRM is either added to or averaged with the score given by the other high-level manager to determine who will be hired.  (C - Chambers ¶3.) Thus, numerous Plaintiffs and HRMs acknowledge that the score they determine for each candidate, which they arrive at independently, constitutes 50 percent of the final input into who gets hired:

> Q.    But you told me that almost all of the time—the majority of the time, in your words—the person with the highest score was hired.
>
> A.    Yes.
>
> Q.    So the majority of the time, the score in which you had 50 percent of the input decided who would be hired?
>
> A.    Yes.

(Seguinot Depo. 91.)

That is, while many Plaintiffs submitted declarations stating that they do not have any input into hiring decisions,[22] many other Plaintiffs conceded that their input constituted half of the final decision concerning which employee would be hired.[23]  Many Plaintiffs also acknowledge that they and the other manager often scored the same answer differently.  In these instances, the HRM's score, and not the SM's, often prevailed.  (Murphy Depo. 142-44; Lytle Depo. 112-15; Seguinot Depo. 84-88.)

---

[22] *See, e.g.,* C - Lewis ¶¶21-23; C - Madigan ¶19; C - Medina, K. ¶¶15, 18, 23; C - Mueller ¶¶12-13; C - Pinkerton ¶¶18, 21, 26; C - Ramey ¶¶16, 19-20, 24, 28; C - Stewart ¶¶17, 20; C - Wilson ¶20; C - Wong ¶22.

[23] Bolton Depo. 85, 88; Kelley Depo. 95-96, 98; Murphy Depo. 66, 69; Seguinot Depo. 88; C - Avena ¶29; C - Otter ¶¶4-5.  Plaintiff Chiavaroli stated that her evaluation "is influential and the [SM] always takes my feedback and recommendations into consideration when making final hiring decisions." (C - Chiavaroli ¶6.)

As many Plaintiffs emphasized, the decision regarding who to hire is one of the most important decisions made at the store.  (Murphy Depo. 41-42; Kelley Depo. 38; Bolton Depo. 48.)  While some Plaintiffs declared that they have no input into these decisions, many other Plaintiffs acknowledge that they have a significant and often decisive input into the hiring decisions.  This marked differences on such a significant issue[24]—whether HRMs exercise discretion in recommending ultimate hiring decisions— suffice to defeat any collective action treatment.  Essentially, a jury cannot rule the same way for a Plaintiff who declares that she has no input into final hiring decisions, as for one who—as many Plaintiffs have testified—have at least 50 percent of the input into the final hiring decision, even decisions regarding which managers to hire.  (Kelley Depo. 85-87; Lytle Depo. 107; Seguinot Depo. 90-91.)

### b.   Promotion Decisions

Plaintiffs' expert states, based on a review of some opt-in declarations, that HRMs "did not have authority to make any independent decision regarding . . . promotions." (Expert Report at 18; Lytle Depo. 194-195.)  However, multiple Plaintiffs state that, as with hiring decisions, they are influential in promotion decisions at their stores.  They select the candidates to interview for a promotion and often interview them, in which case their scores are considered in the promotion decision.  (C - Chambers ¶4; C - Drake ¶8; C - Medina, P. ¶9; C - Tinaza ¶10.)  As Plaintiff Richardson explains:

> A similar process occurs for promotions, where the
> position is posted online (and sometimes in other locations)
> and internal and external candidates can then apply.  I select

---

[24] As the DOL regulations explain, hiring constitutes a matter of significance for companies. 29 C.F.R. § 541.201-203.

the top-qualified candidates for interviews.  For promotions, the ASM has more input in who to interview, especially with respect to the higher positions, but some ASMs choose to be more involved in this process while others do not.

For promotions, I participate in the interview with another manager.  Again, our scores are averaged and I control 50% of the final score for each candidate.  Again, there have been times when I made the final decision on which candidate to hire, when I felt one candidate was a better fit or better qualified for a position.

(C - Richardson ¶¶11-12.)

### c.    Disciplining Employees

Many Plaintiffs declare that they do not exercise any influence, much less make any decisions, with respect to disciplinary actions.  (C - Brown ¶¶6-7, 14; C - Moening ¶22; C - Frasinetti ¶23; Expert Report at 18.)  They contend that their role in this area is confined to filling-out the necessary forms.  (C - Steele-Jordan ¶¶29-30.)  Plaintiff Lytle, for example, testified that, on any discipline, she merely gathered statements and never made a recommendation:

Q.    Let me—what you mean is, you would not decide in any way what the proper level of discipline is?

A.    Yeah.  No.

Q.    Okay.  Now, would that even be the case when you look[ed] at the facts and you realized—because you knew and understood Lowe's policy—that the proper level of discipline was not being administered?

A.    I send it to my boss to make the decision, and I tell them, you know what—for example, they want to terminate this employee or they want to give a written warning to this employee that has been late only one time, can you review this, and they will say, yes, it goes, or no, it doesn't.

32

> Q.      And would the area human resources manager, for example, Sheilitha Hastings—let's take her as an example. Would she ever tell you, tell me what your recommendation of discipline is?
>
> A.      No.  Sheilitha never asked for our input.  It has to be approved by her.  That's the way she did things.

(Lytle Depo. 128-129.)  Some Plaintiffs similarly declared that they never made recommendations regarding discipline.  (C - Byford ¶14; C - Clifford ¶¶18, 22, 26, 29; C - Frasinetti ¶23.)

Other Plaintiffs, however, state they have intimate involvement during the entire disciplinary process, including making recommendations, coaching managers as to the appropriate level of discipline, and even overriding disciplinary decisions made by the SM or the ASMs.  Plaintiff Bolton, for example, testified that she partners with SMs to make disciplinary decisions and has advised SMs to change the level of discipline:

> Q.      And there are times in which after you go through that process and ask those questions and just basically investigate what is going on, you go back to the ASM and you say, you know what, at this instance we cannot write this person up, or we should not write this person up?
>
> A.      It is my recommendation, yes.
>
> Q.      Is your recommendation followed many times, often?
>
> A.      Sometimes it is and sometimes it is not, but when it is not going to be followed, I let the store manager know, I give them a heads up.
>
> Q.      But there are times in which the ASM comes to you and says I want to discipline this employee, and after you gather the facts you go back and say, no, I don't think you can, and then that's the end of it?
>
> A.      Yes, there are some times when that is the case.

> Q.      There are also times in which after you investigate you say, well, yes, we should issue discipline but maybe not the level of discipline that you wanted to issue?
>
> A.      Yes.
>
> Q.      That is, you say that to the ASM?
>
> A.      Yes.
>
> Q.      And you as a store administer discipline, but the discipline you recommend, not the one the ASM recommended?
>
> A.      Right.  It doesn't necessarily mean they do it.
>
> Q.      But they often do it?
>
> A.      Yes, they often do.
>
> Q.      That is, they often follow your recommendation [regarding discipline]?
>
> A.      Yes.

(Bolton Depo. 106-107.)

Other Plaintiffs explain that, before a manager (even the SM) may finalize any discipline, the HRM must review the issues and approve the discipline.  (C - DeRoche ¶9; C - Mott ¶11.)  If the HRM does not agree with the discipline to be administered, the HRM must coach the manager (again, even the SM) about the appropriate level of discipline.  (A -Seaver ¶11; A - Seifried ¶12; C - Hoff ¶11; C - Medina, P. ¶13.)  As Plaintiff Bolton explained, she will often tell the manager that the discipline the manager has decided to issue (even termination) is not appropriate.  (*Id.*; C - Avena ¶38;  C - Medina, P. ¶13; C - Mott ¶11; C - Richardson ¶13.)  And, managers often change the level of discipline because they are told to

do so by the HRM.  (*Id.*)  Plaintiffs Drake and Mott even declared that they have initiated discipline of employees on their own in some instances.  (C - Drake ¶11; C - Mott ¶12.)

Given this testimony, the record on this critical issue—what discipline to administer employees—differs sharply.  While some Plaintiffs claim that they play only a clerical role in disciplinary decisions, others acknowledge that they influence directly whether an employee is to be disciplined and what level of discipline will be administered.  (C - Chambers ¶6; C - Richardson ¶13.)  Such contrasts on a critical issue render collective action treatment unwarranted. *Whineglass*, 2013 WL 2237841 at *6; *Anderson*, 488 F.3d at 953.

### d.    Investigations

HRMs at Lowe's stores are often involved in investigations, including investigations of disciplinary or performance issues, attendance, or harassment or discrimination allegations.[25]  Many Plaintiffs declared that their role during investigations is merely clerical. Plaintiff Lytle, for example, testified that her only role in investigations was to collect statements:

> Q.    So let's talk about the word "partnering."  What do you mean by that?
>
> A.    For example, [at her prior employer] we have to do an investigation for sexual harassment, and I do my investigation, I have my statements, my pictures, my videos, everything.  I will go to the store manager and I will say, I would advise you to terminate, and the store manager will say you know what, I think you are right, let's do it.

---

[25] This District has recognized that the degree of independent judgment and discretion a manager exercises in conducting investigations is a crucial piece of the administrative exemption.  *Juback v. Radioshack Corp.*, 808-CV-768-T-24TBM, 2009 WL 1259990, at *3-4 (M.D. Fla. May 6, 2009).

At Lowe's it was different.  I will do my statement, my pictures, my videos, and I have to give all of that to Ms. Sheilitha [the AHRM].

Q.     And you wouldn't even provide a recommendation?

A.     They don't allow us to do that.

Q.     They would never ask for a suggestion?

A.     No, they wouldn't allow us to do that.

Q.     I want to be clear on this.  When you were doing investigations, whether it's disciplinary or sexual harassment or discrimination, when that was happening at your store, you collected statements –

A.     Yes.

\* \* \*

Q.     And after you collect[ed] statements you submitted that to the area human resources manager?

A.     Yes, definitely.

Q.     And you never made a suggestion as to what the discipline would be?

A.     No.

Q.     You never made a recommendation?

A.     We were not allowed to.

Q.     Okay.  So you never made one?

A.     No.

(Lytle Depo. 71-73.)

On the other hand, numerous Plaintiffs describe how they exercise discretion during investigations of employee misconduct or complaints, including sexual harassment and discrimination.  They often decide on an investigation plan, determine who to interview and

what documents to review, conduct investigations on their own, ask unscripted questions, and give recommendations as to discipline, which are frequently adopted by superiors. (Kelley Depo. 119; Murphy Depo. 29-31, 33-34; A - Seifried ¶13; C - Avena ¶35; C - Chambers ¶6; C - Chiavaroli ¶8; C - DeRoche ¶9; C - Drake ¶12; C - Hoff ¶12; C - Medina, P. ¶14; C - Mott ¶15; C - Otter ¶6; C - Tinaza ¶13; C - Welsh ¶10.)  Indeed, Plaintiff Richardson declared that he has:

> 100% involvement in discrimination and harassment
> investigations. I lead the investigation and conduct the
> interviews of witnesses. I determine which witnesses to
> interview based on the information provided to me and that I
> gather. . . I make the decision whether or not harassment has
> occurred and I make the decision on what disciplinary action
> or counseling should be conducted.  (C - Richardson ¶15.)

Plaintiff Murphy similarly stated in her LinkedIn resume, which she testified was an accurate reflection of her job duties as a Lowe's HRM, that she would "Conduct investigations and make timely, fact-based recommendations and decisions" as part of her job.  (Murphy Depo. 28-29).  Murphy admitted in deposition that she conducted sexual harassment investigations by herself, during which she started by asking questions from script, but then tailored the questions based on the situation and her experience.  (Murphy Depo. 29-31.)  After the investigation, Murphy would often give her recommendation to the AHRM, who took it into consideration and valued Murphy's input.  (Murphy Depo. 33-34.)

Even among Plaintiffs who describe a more detailed involvement with investigations, the level of involvement and influence differs sharply.  The degree of an HRM's involvement often depends on the HRM's level of experience, the trust developed with the AHRM (currently the HRM's direct supervisor), and when the investigation took place.  Kathy

Seifried, an AHRM who supervises directly 26 HRMs and has first-hand knowledge of what HRMs do in this and other areas, explains that she allows HRMs to exercise different levels of involvement in investigations depending on the HRM's tenure and experience level.  (A - Seifried ¶13.)  More experienced HRMs often start investigations before consulting with the AHRM, develop the investigation plan alone, and conduct the interviews and document reviews on their own.  (*Id.*)  They make final recommendations, on which the AHRM merely signs off.  (*Id.*)  Other less-experienced HRMs, however, consult closely with their supervising AHRM, who reviews their investigation plans and works with the HRM to formulate a recommendation.  (*Id.*)

### e.    Clerical Duties

Many Plaintiffs claim that they spent the majority of their time engaged in clerical, manual, and non-office work.  In fact, some Plaintiffs declared that they spend as much as between 80-90% of their time on clerical work related to payroll.  (C - Moening ¶16; C - Young ¶20).  Other Plaintiffs spent from 1 hour to 15 hours a week on such work.  (Kelley Depo. 131; Murphy Depo. 83; C - Chambers ¶7; C - Drake ¶18; C - Mott ¶18.)  Some Plaintiffs claimed having to work Kids' Clinics, spending a number of hours on the sales floor each day, and cleaning parts of the store.  (C - Conway ¶34; C - Cerecedes ¶31; C - Finch ¶29; C - Hill ¶32; C - Perez ¶¶27, 29.)

To the contrary, many other Plaintiffs declared or testified that they spent little or no time on these clerical activities.  Many Plaintiffs state that they either rarely or never

participated in Kids' Clinics or only helped set it up or find volunteers without working it;[26] did not spend much, if any, time working on the sales floor;[27] and did not spend much time, if any, cleaning parts of the store.[28]  Even this has changed over time.  A few years ago HRMs spent more time processing payroll. (C - Tinaza ¶14.)  Given the adoption of different payroll systems and practices, their time spent processing payroll has been reduced substantially. (*Id.*)  Likewise, the HRM role in the benefits process changed as it became automated and less paperwork intensive.  (Murphy Depo. 81-82.)

　　Here, as with so many other duties, the degree of discretion at issue differs markedly among Plaintiffs.  Courts routinely decertify collective actions where the record shows so much contradictory testimony regarding the discretion exercised by Plaintiffs with respect to significant matters such as interviewing, hiring, staffing, and disciplining employees, as well as the weight accorded to Plaintiffs' recommendations in these areas.  *See Green*, 888 F. Supp. 2d at 1102 (decertifying class where "variations in testimony centered on the weight given a particular Store Manager's hiring recommendations, ranging from Plaintiffs who were free to choose from applicants that Human Resources approved for hire after the background check, to Plaintiffs who hired whomever corporate told them to hire");  *Reyes*, 2007 WL 101808 (decertifying class where "[s]ome [ASMs] took absolutely no role in hiring, while others interviewed prospective employees and made recommendations on hiring" and finding "degree of discretion and authority each ASM exercised varied

---

[26] Lytle Depo. 155; Bolton Depo. 134; Kelley Depo. 138-39; Seguinot Depo. 144-45; C - Chambers ¶9.
[27] C - Chambers ¶11 (has not worked on store floor since 2008); C - DeRoche ¶13; C - Drake ¶19; C - Otter ¶12.
[28] Lytle Depo. 155; Kelley Depo. 136; C - Mott ¶23.

depending on store management and store demographics, making this case particularly unsuitable for collective treatment when applying exemption analysis"); *Carlson*, 2006 WL 2830015 at *10; *see also Beauperthuy*, 772 F. Supp. 2d at 1132 (decertifying class where some managers "testified that they participated in the hiring process" while others did not); *Johnson*, 561 F. Supp. 2d at 584 ("Many plaintiffs also testified that even if they did not single-handedly hire new employees, their store managers generally gave weight to their hiring recommendations," while "many other plaintiffs testified that they were either not involved in the hiring process or involved only very infrequently," which "illustrates the variegated nature of plaintiffs' employment experiences").  Given the record here, the Court should decertify Plaintiffs' claim.

### 4.   Lowe's Must Be Permitted To Raise Individualized Defenses Based On Plaintiffs' Contradictory Testimony And Credibility Issues.

In its defense, Lowe's plans to show contradictions between sworn statements in Plaintiffs' declarations, previously filed with the Court, and statements they made related to their job duties in online postings and resumes, as well as other credibility issues raised by the evidence in the record.  Lowe's also intends on questioning the Plaintiffs who submitted declarations that were used in support of Lowe's opposition to Plaintiff's motion for conditional certification, in which they declared under oath that they exercised independent judgment and discretion through specific examples, but then joined the lawsuit as opt-in Plaintiffs who allege they were misclassified.[29]  The raising of such contradictions are clearly permitted based on all of the evidence in the record.  *White v. 14051 Manchester Inc.*, 4:12-

---

[29] These Plaintiffs are Ed Avena, Dustin Chambers, Lisa Chiavaroli, Michelle DeRoche, Tracy Drake, Joni Hoff, Perla Medina, Michelle Mott, Gaylen Otter, Miles Richardson, Heather Sweeney, Dorothy Tinaza, and Aimee Welsh.

CV-469 JAR, 2014 WL 2442131, at *3 (E.D. Mo. May 30, 2014) (court considered previously filed declarations with contradictory deposition testimony); *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 67 (E.D.N.Y. 2012) (relying on "cited inconsistencies between the 2010 Declarations of Ruiz and Vargas and their respective 2011 deposition testimony" in decertifying class).  Furthermore, courts recognize a defendant's right to raise contradictory testimony and evidence, and have held that this right to individually question plaintiffs supports decertification.

In *Aquilino*, where defendant indicated an intention "to present individualized evidence as to each Opt–In's claims," including its intention "to bring to light contradictions between individual Plaintiffs' resume statements, declarations or interrogatory answers, and deposition testimony," the court agreed that "the potential defenses of Defendant would make collective treatment of this action unmanageable."   2011 WL 564039 at *9.  The court recognized that defendants are "entitled to impeach the credibility of individual Opt–Ins by bringing to light misrepresentations about duties that they may have made on their resumes." *Id.*  Likewise, defendants "may also try to impeach the credibility of individual Opt–Ins by questioning those Opt–Ins about contradictory responses given when providing declarations, interrogatory answers, and deposition testimony."  *Id.*  The court recognized that "[s]uch individual questioning would likely make it difficult and confusing for the fact finder to make both credibility determinations and to discern whether each individual Opt–In is exempt under the FLSA."  *Id.* Here, there are numerous examples of contradictory testimony and credibility concerns that Lowe's must be able to raise.

41

For example, despite claiming they were misclassified as exempt employees, Plaintiffs Stacey Hartley, Piper Brown, and Melissa Murphy made statements in resumes admitting that they exercise independent judgment and discretion in hiring, staffing, and investigatory matters.  (Exhs. E-1, E-2, and E-3.)  Plaintiff Hartley, for example, stated that her duties at Lowe's included to "[i]nvestigate disputes by collecting information relevant to the case and *deciding on proper course of action*."  (Exh. E-1.) (Emphasis added.)  Plaintiff Brown stated that she "*[c]reated and implemented* various programs to enhance Lowe's mentorship, recruitment, employee engagement and training programs."  (Exh. E-2.) (Emphasis added.)  Plaintiff Murphy stated that she "[c]onduct[ed]  investigations and *made fact based recommendations and decisions*."  (Exh. E-3.) (Emphasis added.)  These are but three examples of Plaintiffs who trumpet in their resumes, on the one hand, that they exercise independent judgment and discretion, but disavow those statements either in their declarations or by opting-in as Plaintiffs.[30]

---

[30] Other examples of such contradictions between Plaintiffs' resumes and their claim that they did not perform exempt duties are attached as Exhibit "E-4 through E-10."  Plaintiffs' online resumes include the following claims: "Responsible for all aspects of employee relations, including hiring, terminations, disciplinary actions, investigations and proper documentation to ensure consistent policies were enforced among labor force."  (E-4 – Coatney.)  "Conduct interviews, gathering, analyzing information, reaching sound conclusions & recommending solutions &r (sic) alternatives that are generally accepted by management."  (E-5 – Diggins.)  "As a member of the store senior management team, provided consultative human resources services to managers in their daily operations. Created manpower and succession plans. Managed payroll expenses to sales. Drove the recruiting and hiring processes for the store." (E-6 – Fortson.)  "Oversee and direct semiannual employee appraisal process, approve salary increases and promotion/demotion and/or training recommendations, create performance action plans and establish consistent practices within the policies and procedures guidelines. Monitor and handle disputes, administer disciplinary process, provide consultation on all employee terminations and reductions in staff. Partner with senior management staff to develop a positive and proactive employee relations strategy to increase morale and minimize poor employee relations issues." (E-7 – Freeman.)  "Supported company's legal team in

Furthermore, numerous Plaintiffs submitted declarations that Lowe's relied on in opposing conditional certification, in which they declared, under oath, that they routinely exercised independent judgment and discretion with respect to: recruiting efforts they make;[31] their selection of candidates to interview;[32] deciding whether to interview more than the minimum number of candidates;[33] whether to reject a candidate after an interview and not pass the candidate on, or recommend hiring the candidate for a different position;[34] the questions they ask in employment interviews;[35] the persons they choose to speak with during investigations and the questions they ask;[36] and setting their day-to-day schedules.[37]

Many of these Plaintiffs also stated, under oath, that they played key roles and made influential decisions and recommendations that SMs and ASMs adopted or valued with

---

response to EEOC charges by completing investigations, creating response documentation, and appearing in mediation." (E-8 – Legette.)  "Address employee concerns through prompt investigation and follow up of resolution." (E-9 – McLaughlin.)  "Solely responsible for full life cycle HR administration and recruiting. . . . [S]upervised HR coordinator." (Pagliari, E-10.)

[31] C - Avena ¶¶19-22; C - Chiavaroli ¶4; C - DeRoche ¶4; C - Tinaza ¶5; C - Welsh ¶5.

[32] C - Avena ¶¶23-24; C - Chambers ¶2; C - Chiavaroli ¶5; C - DeRoche ¶5; C - Drake ¶4; C - Hoff ¶8; C - Medina, P. ¶4; C - Mott  ¶5; C - Otter  ¶4; C - Richardson  ¶4; C - Tinaza  ¶6; C - Welsh  ¶6.

[33] C - Chambers ¶2; C - Drake ¶5; C - Medina, P. ¶5; C - Mott ¶5; C - Richardson ¶3; C - Tinaza ¶7.

[34] C - Avena ¶28; C - Medina, P. ¶6; C - Mott ¶6; C - Richardson ¶6; C - Tinaza ¶9; C - Welsh ¶9.

[35] C - Avena ¶26; C - Richardson ¶5; C - Welsh ¶7.

[36] C - Avena ¶5; C - Chambers ¶6; C - Chiavaroli ¶8; C - DeRoche ¶9; C - Drake ¶12; C - Hoff ¶12; C - Medina, P. ¶14; C - Mott ¶15; C - Otter ¶6; C - Richardson ¶15; C - Tinaza ¶13; C - Welsh ¶10.

[37] C - Avena ¶17; C - Chambers ¶12; C - Chiavaroli ¶13; C - DeRoche ¶14; C - Drake ¶13; C - Mott ¶21; C - Otter ¶13; C - Richardson ¶21; C - Tinaza ¶17.

respect to:  hiring of employees;[38] discipline and counseling of employees;[39] and staffing

decisions for their stores.[40]  Plaintiff Mott plainly stated, "The HRM is part of the

management team, and as the HRM, I feel as if I have significant influence in the store."  (C -

Mott ¶22.)  Plaintiff Chiavaroli opined, "In my position as Human Resources Manager, I

regularly make decisions and take action at my own discretion."  (C - Chiavaroli ¶14.)

Plaintiff Sweeney acknowledged that, after "having observed several HRMs and assisting

with other stores, in my experience, Lowe's HRMs exercise a great deal of discretion in their

role and wear many hats."  (C - Sweeney ¶2.)  All of this evidence contradicts their current

contentions that they were misclassified.

Clearly, based on these credibility issues and contradictions between their prior

declaration testimony and current status as Plaintiffs, any trial on Plaintiffs' alleged

misclassification would devolve into mini-trials regarding individualized defenses that

Lowe's is permitted to raise, which warrants decertification.  *See Green*, 888 F. Supp. 2d at

1103 (decertifying manager class where "evidence exists calling into question the credibility

of Plaintiffs' claims, including Plaintiffs' own resumes touting their management

responsibilities as well as their contradictory testimony and sworn discovery responses");

*Reyes*, 2007 WL 101808 at *5 (decertifying class because defendant was entitled "to use

---

[38] C - Avena ¶29; C - Chambers ¶3; C - Chiavaroli ¶6; C - DeRoche ¶6; C - Drake ¶¶6-7; C - Hoff ¶8; C - Medina, P. ¶8; C - Mott ¶¶6-7; C – Otter ¶¶4-5; C - Richardson ¶¶9-10; C - Sweeney ¶¶4-6; C - Tinaza ¶8; C - Welsh ¶8.
[39] C - Avena ¶¶38-39; C - Chambers ¶6; C – Chiavaroli ¶8; C - DeRoche ¶9; C - Drake ¶¶11, 15; C - Hoff ¶¶5, 10-11; C - Medina, P. ¶13; C - Mott ¶¶11-12; C - Richardson ¶¶13, 16; C - Tinaza ¶12; C - Welsh ¶¶10-11.
[40] C - Avena ¶32; C - Chiavaroli ¶10; C - DeRoche ¶11; C - Drake ¶9; C - Hoff ¶¶3-4; C - Medina, P. ¶¶10-12; C - Mott ¶17; C - Otter ¶10; C - Tinaza ¶¶4, 15.

employment records and/or other contradictory witness testimony to rebut some of the Plaintiffs' allegations that they had absolutely no management duties").

### 5.    Fairness and Procedural Considerations Mandate Decertification.

Given the wide variance in the evidence, the absence of common proof, and the necessity of highly individualized fact determinations for almost 900 opt-in Plaintiffs across the country, allowing this case to proceed as a collective action would be unfair and unmanageable.  This Court recognizes that the purpose of collective actions under the FLSA is to "allow the judicial system to efficiently resolve the claims of multiple plaintiffs in one proceeding where those claims contain common issues of law and fact arising from the same alleged unlawful conduct."  *Whineglass*, 2013 WL 2237841 at *10.  However, as this Court held in decertifying a collective action in *Whineglass*, "judicial economy is not served" when "each plaintiff's claim raises distinct factual and legal issues which would essentially evolve into four distinct trials."  *Id.* "The need for such individualized inquiries contravenes the 'basic theory of judicial economy upon which the certification of collective actions is based.'"  *Id.*  Thus, this Court in *Whineglass* found that "any efficiency gained through bringing this action collectively would be outweighed by the substantial likelihood of distinct trials, and the risk of confusion and prejudice" and decertified the collective action.  *Id.* at *11.  This rationale has been echoed by numerous courts in decertifying manager misclassification claims such as the instant action.[41]  The same is true here.

---

[41] *See Green*, 888 F. Supp. 2d at 1104 (court held that "Plaintiffs are not similarly situated with respect to key issues in the exemption analysis" and "proceeding as a class would not be efficient, as it would likely result in two trials, one to establish liability and a second to determine damages"); *Reyes*, 2007 WL 101808 at *6 ("In light of the individual analysis each Plaintiff's claim will require, the judicial inefficiency of having essentially forty plus

In this case, the evidence in the record shows that the disparate factual and employment settings of Lowe's HRMs would make a collective action trial unmanageable, as individual inquiries under the multiple factors considered in the administrative exemption analysis would be required as to each Plaintiff.  Just as in *Green*, "Plaintiffs have not shown that they are similarly situated on many of the fact-specific issues that must be addressed at a trial on the merits of their misclassification claim." *Green*, 888 F. Supp. 2d at 1103.  The individual defenses listed above that Lowe's would be entitled to raise for each Plaintiff further highlight the unmanageability of a collective action trial.  *Id.*  Furthermore, just as in *Green*, the deposition and declaration testimony in this case "shows that it is not possible to develop common testimony from the [HR] Managers regarding their daily responsibilities and duties, or the weight given their recommendations regarding hiring . . . and discipline." *Id.* at 1104.

This is not a case where representative evidence can be utilized.  As the courts in both *Green* and *Johnson* recognized in decertifying manager misclassification collective actions, the use of "representative proof is problematic if for every instance in which an opt-in plaintiff reported that she hired subordinates, there is an alternative response to the contrary." *Id.* (quoting *Johnson*, 561 F. Supp. 2d at 586).[42]  In *Johnson*, the court noted that "Big Lots

---

mini-trials clearly outweighs any potential benefits in proceeding as a collective action."); *Carlson*, 2006 WL 2830015 at *11 (when the court concludes that "the dominant issue at trial—whether the administrative exemption applies to an employee—cannot be adjudicated collectively, the Court reaches the inevitable conclusion that fairness and procedural considerations also favor decertification" because it "cannot fairly and efficiently administer collective actions that require individualized inquiry into the exempt status of several hundred individuals").

[42] *See also Reyes*, 2007 WL 101808 at *6 ("In light of the individual analysis each Plaintiff's claim will require, the judicial inefficiency of having essentially forty plus mini-trials clearly

cannot prove a common defense to the claims of the class members by calling a handful of witnesses whose testimony strongly suggests that ASMs are properly classified, because there are other witnesses who will testify to the contrary." *Johnson*, 561 F. Supp. 2d at 586. The evidence adduced in this case exemplifies the same problem with representative proof here.  As just one example, for Plaintiffs who state they exercised no discretion in the interviewing and hiring process,[43] there are other Plaintiffs who acknowledge that they did.[44] To allow this case to proceed as a collective action with representative proof would be to permit an "all or nothing" trial that potentially prejudices both sides.  Just a month ago, a Magistrate Judge in the Southern District of Florida recommended decertification in an FLSA tip-pool case for this reason, stating that the

> use of representative evidence or damage models would not account for material distinctions between Defendants' liability to different Opt–In Plaintiffs. Defendants would face all-or-nothing liability for large groups of employees, despite those employees' dissimilar working conditions. Individual Opt–In Plaintiffs would not receive recoveries based on their individual experiences. Rather, they would be grouped with other Opt–In Plaintiffs and receive either windfalls or insufficient recoveries.

*Mathis v. Darden Restaurants*, 12-61742-CIV, 2014 WL 4428171, at *5 (S.D. Fla. Sept. 1, 2014).  These same fairness concerns merit decertification in this case.[45]

---

outweighs any potential benefits in proceeding as a collective action," as plaintiffs' claims "are not amenable to generalized evidence" ).

[43] *E.g.,* C - Bell ¶¶18, 20-21, 26; C - Chisolm-Petties ¶15; C - Wong ¶¶19, 21-22, 26, 29.

[44] Bolton Depo. 85, 88; Kelley Depo. 95-96, 98; Murphy Depo. 66, 69; Seguinot Depo. 88; C - Avena ¶29; C - Otter ¶¶4-5.  In fact, Opt-in Plaintiff Chiavaroli stated that her evaluation "is influential and the [SM] always takes my feedback and recommendations into consideration when making final hiring decisions." (C - Chiavaroli ¶6.)

[45] The opt-in Plaintiffs' claims will not be lost, as courts typically allow them to re-file their individual claims after decertification.  *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1155 (D. Minn. 2005) ("the Court will stay this order for a period of 60 days, during which time the opt-in plaintiffs may re-file individual claims").

## IV.    CONCLUSION

For the reasons stated above, the Court should grant Lowe's Motion to Decertify and dismiss the improperly joined Plaintiffs without prejudice.

Dated this 1st day of October, 2014.

Respectfully submitted,

HUNTON & WILLIAMS LLP
*Counsel for Defendants*
Sabadell Financial Center
1111 Brickell Avenue, Suite 2500
Miami, Florida  33131
Tel:  (305) 810-2500
Fax: (305) 810-2460

By: /s/ Juan C. Enjamio
       Juan C. Enjamio
       Trial Counsel
        Florida Bar No. 571910
        *jenjamio@hunton.com*
       Anna Lazarus
        Florida Bar No. 41337
        *alazarus@hunton.com*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 1st day of October, 2014, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: Mitchell L. Feldman, Esq., Feldman, Fox & Morgado, P.A., 501 North Reo Street, Tampa, Florida 33609.

By: /s/ Juan C. Enjamio
       For Hunton & Williams LLP

48